Thomas COMELLA, et al., Plaintiffs,

v.

ST. PAUL MERCURY INS.
CO., et al., Defendants.

No. 1:00CV2664.

United States District Court,
N.D. Ohio,
Eastern Division.

July 24, 2001.

Claudia R. Eklund, Lowe Eklund & Wakefield, James A. Lowe, Lowe Eklund & Wakefield, Cleveland, OH, for Plaintiffs.

Gary A. Vick, Weston, Hurd, Fallon, Paisley & Howley, Hilary S. Taylor, Weston, Hurd, Fallon, Paisley & Howley, Catherine A. Davis, Gallagher, Sharp, Fulton & Norman, Gary L. Nicholson, Gallagher, Sharp, Fulton & Norman, John D. Sayre, Nicola, Gudbranson & Cooper, Vincent A. Feudo, Nicola, Gudbranson & Cooper, Cleveland, OH, for Defendants.

### MEMORANDUM & ORDER CERTIFYING QUESTIONS TO THE SUPREME COURT OF OHIO

O'MALLEY, District Judge.

Pursuant to Rule XVIII of the Rules of Practice of the Supreme Court of Ohio,

this Court hereby **CERTIFIES** to the Supreme Court of Ohio certain unresolved questions of state law. This Court believes these questions "may be determinative of the proceeding" pending before it and that "there is no controlling precedent in the decisions of [the Supreme Court of Ohio]." Ohio Sup.Ct. Rule of Prac. XVIII § 1. Furthermore, it appears likely that the certified questions are likely to arise in other actions brought in both Ohio state and federal courts.

### A. Certified Questions.

#### Question 1.

In *Scott–Pontzer v. Liberty Mut. Fire Ins. Co.*, 85 Ohio St.3d 660, 710 N.E.2d 1116 (1999), and *Linko v. Indemnity Ins. Co. of N. Am.*, 90 Ohio St.3d 445, 739 N.E.2d 338 (2000), the Ohio Supreme Court analyzed Ohio Rev.Code § 3937.18. In both cases, however, the Ohio Supreme Court examined versions of the statute enacted prior to September 3, 1997. Ohio Rev.Code § 3937.18(C) was amended on September 3, 1997, to read, in pertinent part, as follows:

> A named insured's or applicant's rejection of [UM/UIM] coverages ..., or a named insured's or applicant's selection of [lower amounts of] such coverages ..., shall be in writing and shall be signed by the named insured or applicant. A named insured's or applicant's written, signed rejection ... [or] selection of such coverages ... shall be effective on the day signed, *shall create a presumption of an offer of coverages consistent with division (A) of this section*, and shall be binding on all other named insureds, insureds, or applicants.

(Emphasis added).

Is the presumption referred to in this statute a *rebuttable* presumption, or a *conclusive* presumption?

#### Question 2.

If the answer to question 1 is that the statutory presumption is rebuttable, what measure of proof is needed to rebut the presumption, and who bears the burden of supplying that proof?

For instance,

a. Will proof that the insurer made no *written* offer of coverage be sufficient to rebut the presumption? or,

b. Will proof that the offer did not include the precise terms referred to in *Linko v. Indemnity Ins. Co. of N. Am.*, 90 Ohio St.3d 445, 739 N.E.2d 338, 342 (2000) ("a brief description of the coverage, the premium for that coverage, and an express statement of the UM/UIM coverage limits") operate to rebut the presumption? or,

c. Will the presumption remain as long as the evidence establishes that the insured knowingly chose to reject UM/UIM coverage, regardless of how knowledge that such coverage was available was obtained?

### B. Caption of the Case.

This case is styled *Thomas M. Comella, et al. v. St. Paul Mercury Ins. Co., et al.*, No. 1:00–CV–2664 (N.D.Ohio).

### C. Names of the Parties.

There are two named plaintiffs: Thomas Comella and Patricia Comella. There are four named defendants: (1) St. Paul Mercury Insurance Company, (2) Guaranty National Insurance Company, (3) the City of Highland Hts., Ohio, and (4) the Northern Ohio Risk Management Agency Self–Insurance Pool, Inc.

### D. Counsel for the Parties.

Counsel for the parties are as follows:

1. For Thomas Comella and Patricia Comella:

Claudia R. Eklund, Esq.
James A. Lowe, Esq.
610 Skylight Office Tower
1660 West Second Street
Cleveland, Ohio 44113–1454
216–781–2600
216–781–2610 fax
Email: *ceklund@lewlaw.com*
Email: *jlowe@lewlaw.com*

2. For St. Paul Mercury Insurance Company:
Gary A. Vick
Hilary S. Taylor
Weston, Hurd, Fallon, Paisley & Howley
2500 Terminal Tower
50 Public Square
Cleveland, OH 44113–2241
216–241–6602
216–621–8369 fax
Email: *gvick@westonhurd.com*
Email: *htaylor@westonhurd.com*

3. For Guaranty National Insurance Co.:
Catherine A. Davis
Gary L. Nicholson
Gallagher, Sharp, Fulton & Norman
1501 Euclid Avenue
7th Floor, Bulkley Building
Cleveland, OH 44115
216–241–5310
216–241–1608 fax
Email: *cad@gsfn.com*
Email: *gnicholson@gsfn.com*

4. For Northern Ohio Risk Management Agency Self–Insurance Pool, Inc. and City of Highland Heights:
John D. Sayre
Nicola, Gudbranson & Cooper
Landmark Office Towers
Republic Building, Ste. 1400
25 West Prospect Avenue
Cleveland, OH 44115–1048
216–621–7227
216–621–3999 fax
Email: *johndsayre@aol.com*

### E. The Moving Party.

Pursuant to section 2(E) and section 5 of Rule XVIII of the Rules of Practice of the Supreme Court of Ohio, the Court hereby designates Thomas and Patricia Comella as the moving parties / petitioners, for the purposes of this certification. Furthermore, the Court hereby designates St. Paul Mercury Insurance Company, Guaranty National Insurance Company, the City of Highland Hts., Ohio, and the Northern Ohio Risk Management Agency Self–Insurance Pool, Inc. as the adverse parties / respondents, for the purposes of this certification.

### F. Filing of Certification Order.

Pursuant to section 3 of Rule XVIII of the Rules of Practice of the Supreme Court of Ohio, the Court hereby **ORDERS** the Clerk of Court to:

(1) serve copies of this Order upon all counsel of record in this case; and

(2) file this Order under seal of this Court with the Ohio Supreme Court, along with proof of service. In addition, the Clerk of Court is ordered to file with the Ohio Supreme Court, for that Court's convenience, copies of the official Court docket and also the following docket entries: (1) the pleadings (docket nos. 1, 5, 9, 10, 11, 14, 32, 36, 39, & 43); and (2) the pending summary judgment motions and all related briefs and exhibits (docket nos. 22, 26, 28, 30, 31, 35, 44, 47, 49, 54, 55, 56, 59, 60, 62, 63, 64, 67, 68, & 69).

### G. Statement of the Case.

Plaintiffs Thomas and Patricia Comella bring this action against the following defendants: (1) St. Paul Mercury Insurance Company ("St.Paul"); (2) Guaranty National Insurance Company ("Guaranty National"); (3) the City of Highland Hts., Ohio ("Highland"); and (4) the Northern Ohio Risk Management Agency Self–In-

surance Pool, Inc. ("NORMA"). The Comellas allege that, on June 25, 1999, Thomas was operating a vehicle in the scope of his employment as an employee and elected official of Highland. Betty Doran rear-ended Thomas, causing him catastrophic spinal cord injuries, leaving him a quadriplegic. Doran had an insurance policy, issued by GEICO, that provided liability coverage in the amount of $50,000; as such, Doran was underinsured.

St. Paul had issued a $1 million liability insurance policy to Highland and to NORMA (of which Highland was a member), and Guaranty had issued a $9 million umbrella liability insurance policy to NORMA. The Comellas made claims for coverage under both policies, but the claims were denied. Accordingly, the Comellas now state claims for: (1) breach of contract; and (2) a judgment declaring they are "insureds" under the St. Paul and Guaranty insurance policies, and that they are due benefits pursuant to underinsured motorists coverage. Guaranty and St. Paul filed mirror-image counterclaims, asking the Court for a judgment declaring they do not owe any coverage to the Comellas under the insurance policies.

The Comellas have filed a motion for summary judgment (docket no. 22), and the defendants have each filed a cross-motion for summary judgment (docket nos. 26, 44, & 47). The parties agree that the material facts are not in dispute.

## 1. The Undisputed Facts.

### A. The Accident.

Every year, Highland Heights sponsors an event known as the "City of Highland Heights Home Days." Local ordinances explain that this event is a "celebration" which includes amusements, exhibits, refreshment stands, sporting events, and so on—in short, a city fair. Highland Heights Admin. Code § 145.05. The ordinances empower a "Highland Heights Home Days Committee" to arrange for and manage the festival, including entering into contracts "of every nature and description." Id. The ordinances also authorize the appointment of a Committee Chairman. Id. §§ 145.06–07.

In 1999, Thomas Comella was a Highland Heights City Councilman and served as Council president. He was also appointed as Chairman of the Highland Heights Home Days Committee. On June 25, 1999, Comella was driving in his personal vehicle to a business called John's Fun House, to see about obtaining costumes for the Home Days event. Unfortunately, Betty Doran, who was driving a recreational vehicle, struck the rear of Comella's vehicle. The accident broke Comella's neck, rendering him a quadriplegic and permanently blind. Comella now resides at the Manor Care Nursing Home, where he requires total care. Doran pleaded guilty to a violation of the applicable assured clear distance statute.

### B. Insurance Coverage.

### i. NORMA's Self–Insurance.

Doran was covered by an automobile insurance policy issued by the GEICO Insurance Company, with bodily injury liability limits of $25,000 per person and $50,000 per accident. GEICO has tendered its policy limits in connection with the Comellas' claims against Doran, and GEICO is not a party to this lawsuit. Because Doran did not have assets or insurance coverage that could compensate the Comellas for the full amount of the serious injuries and damage she caused, the Comellas looked for other sources of insurance coverage. The Comellas first made a successful claim under their own automobile insurance underinsured motorists coverage (which had liability limits similar to those of Doran). The Comellas then learned that Highland Heights had purchased in-

surance coverage from both St. Paul and Guaranty, to protect itself against certain types of liability. The Comellas filed claims under both policies, but these claims were denied.

The specific type of insurance coverage Highland obtained from St. Paul and Guaranty, and the purchasing mechanism Highland used, is significant. With regard to the purchasing mechanism, Highland Heights joined a group of other municipal corporations in 1987 to form an entity known as the Northern Ohio Risk Management Association Self–Insurance Pool, Inc., or NORMA.[1] The essential idea behind NORMA was to spread the risk of certain types of liability among the participating municipalities, while also decreasing total administrative costs. The creation of self-insurance pools, like NORMA, is authorized by Ohio statute:

> political subdivision[s] may, pursuant to a written agreement and to the extent that it considers necessary, join with other political subdivisions in establishing and maintaining a joint self-insurance pool to provide for the payment of judgments, settlement of claims, expense, loss, and damage that arises, or is claimed to have arisen, from an act or omission of the political subdivision or any of its employees in connection with a governmental or proprietary function and to indemnify or hold harmless the subdivision's employees against such loss or damage.

Ohio Rev.Code § 2744.081(A). Not only may such pools enter into a mutual self-insurance arrangement, they may also purchase insurance policies to cover their collective losses. *See* Ohio Rev.Code § 2744.081(C) ("[a] joint self-insurance pool, established under this section, is deemed a separate legal entity for the public purpose of enabling the members of the joint self-insurance pool to obtain insurance or to provide for a formalized, jointly administered self-insurance fund for its members"); Ohio Rev.Code § 2744.081(E)(1) ([a] joint self-insurance pool, in addition to its powers to provide self-insurance ..., may also include any one or more of the following forms of property or casualty self-insurance for the purpose of covering any other liabilities or risks of the members of the pool: (a) Public general liability, professional liability, or employees liability; (b) Individual or fleet motor vehicle or automobile liability and protection against other liability and loss associated with the ownership, maintenance, and use of motor vehicles; * * * *).

Ohio self-insurance pools, then, may elect both to self-insure with regard to some losses, and to buy insurance to protect against other losses. This is what NORMA did. NORMA's Agreement and Bylaws explain that "included within its powers and obligations is the purchasing of Excess and Stop Loss Insurance to supplement the Joint Self-insurance Pool funds." Bylaws Art. I, at 2. The Agreement then states that the member municipalities "do not intend to utilize the loss fund of [NORMA] to cover matters in which aggregate and excess coverage is not contemporaneously provided." Bylaws Art. IX, at 22. *See also* Bylaws App. C at 2 ("[u]nless specifically and additionally agreed to and provided for by the Members or Board of Trustees, pooled coverage is provided and applies only if excess insurance purchased by the pool would apply, but for the Self Insurance Retention of the Pool"). In essence, the NORMA participating municipalities agreed to: (1) pay for certain losses out of a shared self-insurance fund, into which they all would contribute a certain amount; and (2) buy "excess" insurance to

---

1. Highland Heights initially joined five other Ohio municipalities to create NORMA in 1987. Subsequently, seven other municipal entities also joined.

pay for other, certain losses that exceeded a given size.

Specifically, NORMA's Bylaws set out the "sequence of obligations" of the member municipality, NORMA, and the excess insurance companies. Bylaws Art. X, at 24. "The first $2,500 of any valid claim shall be paid by the Member." *Id.* Next, NORMA will pay the amount of a valid claim "in accordance with the scope of loss protection set out in Article IX" of the Bylaws. *Id.* at 25. Given that Article IX essentially refers to the provisions of any applicable insurance policies, NORMA's obligation depends on its excess insurance. For example, NORMA purchased an excess insurance policy from St. Paul providing $1,000,000 of coverage for loss caused by a member municipality's use of a covered automobile, and the policy states that there exists $150,000 of retained self-insurance for this type of claim. St. Paul Policy form 44460 at 1.[2] Finally, "the next level of responsibility" is assumed by the excess insurers. Bylaws Art. X, at 25.

Notably, the loss coverage provided by NORMA was intended to parallel the coverage provided by the excess insurers. For example, NORMA did *not* buy any insurance coverage to protect against a member municipality's loss for punitive damages, and NORMA did not self-insure against such losses, either. *See* Bylaws App. C. at 1 (NORMA "*shall not provide*

self-insurance coverage in the following areas: (1) punitive or exemplary damages . . . .") (emphasis in original); Bylaws Art. XI, at 22 (NORMA "shall provide loss protection to the extent that protection would be accorded within the terms of the excess and aggregate policies held from time to time by [NORMA] for the benefit of its members. The intent of this Agreement and By-Laws shall be that except to the extent to which the scope of coverage provided by the Agency is specifically expanded by action of the Board of Trustees and its Members, the Members herein do not intend to utilize the loss fund . . . to cover matters in which aggregate and excess coverage is not contemporaneously provided."). A participating municipality was free to independently purchase insurance coverage against losses not covered by NORMA or the excess insurance policies. Bylaws Art. XIII, at 31 ("Membership in [NORMA] shall not preclude any Member from purchasing any insurance coverage above those amounts purchased by [NORMA]").

*ii. The St. Paul Policy.*

NORMA purchased two excess insurance policies. The first policy was purchased from St. Paul, effective from October 1, 1998 through October 1, 1999. The named insureds under the St. Paul policy included NORMA and its 13 members.[3]

---

**2.** Generally, the St. Paul policy provided that NORMA either retained $150,000 in self-insurance, or agreed to a pay a modest deductible (e.g., $5,000 for computer equipment loss, see policy form 42448 at 1). It is settled law that NORMA's actuarial activity, and its retention of a layer of self-insurance, does not transform NORMA into an insurance company; thus, Ohio Rev.Code § 3937.18 and other Ohio insurance statutes do not apply to NORMA. *See* Ohio Rev.Code § 2744.081(E)(2) ("A joint self-insurance pool is not an insurance company. Its operation does not constitute doing an insurance business and is not subject to the insurance laws of this state."); *Public Entities Pool of Ohio v. Sexton,* 2000

WL 331821 at *2–3 (Ohio Ct.App. Mar. 31, 2000) ("We have found that a self-insurer or pool that is organized pursuant to R.C. 2744.081 is exempt from the requirements of R.C. 3927.18(A) with respect to the liability coverage it offers. Therefore, a pool which does provide UM/UIM coverage need not offer it in an equivalent amount by reason of R.C. 3937.18(A).").

**3.** The 1999 members included Bedford Heights, Chagrin Falls, Eastlake, Highland Heights, Maple Heights, Mayfield Heights, Richmond Heights, Solon, South Euclid, City of Hudson, Hudson Township, Hudson Eco-

St. Paul policy form 40811 at 1–2. In exchange for a premium of $299,900, St. Paul provided these insureds a number of coverages; one of these coverages was "Commercial Auto Protection." St. Paul policy form 44460 at 1. The St. Paul policy stated that it provided coverage of

☒ Liability
☐ Uninsured Motorists
☐ No–Fault
☒ Medical Payments

St. Paul policy form 44463 at 1–2. Notably, coverage against loss caused by uninsured motorists was not checked.[4] With regard to "what autos are covered" under the St. Paul policy, the contract stated: " Any Auto". St. Paul policy form 44460 at 1. The contract defined this term as meaning "any owned, rented, leased, or borrowed auto. It includes hired, nonowned, newly acquired, replacement and temporary substitute autos." St. Paul policy form 44449 at 4.

As noted, the St. Paul renewal policy that was in effect on June 25, 1999, when Comella was rear-ended, had an inception date of October 1, 1998. Seven months later, on May 19, 1999, NORMA's president, Robert Tribby, signed a St. Paul form titled "Ohio Selection–Rejection Form, Uninsured and Undersinsured Motorists Coverage, Uninsured Motorists

nomic Development Corporation, and Hudson Economic Education Foundation.

4. The exclusion of uninsured motorists coverage within the *"Auto liability "* section of the St. Paul policy is in contrast to the *"Garage-keepers liability "* section of the policy. Garagekeepers liability provides coverage against loss resulting from garage operations, and the St. Paul policy did provide uninsured/underinsured motorist coverage in connection with such liability, if the loss exceeded the $150,000 in retained self-insurance. St. Paul policy form 40502 at 1.

"$1,000,000 each accident," and that there existed "Self–Insured Retention: $150,000 Each Event Retention." *Id.*

The St. Paul policy went on to list the precise types of automobile liability coverage afforded, by placing an "X" next to those coverages provided, as shown below:

☐ Comprehensive
☐ Collision
☐ Specified Causes of Loss
☐ Towing

Property Damage Coverage." Among other things, the form stated:

Uninsured Motorists Coverage is not mandatory on your policy. Uninsured Motorists Coverage limits equal to, but not in excess of the liability limit on your policy, may be purchased. * * *

\* \* \* \* \* \*

☒I reject Uninsured and Underinsured Motorists Coverage.

\* \* \* \* \* \*

☒ I reject Uninsured Motorists Property Damage Coverage.

St. Paul policy form 2655 at 1. Thus, not only did the St. Paul policy indicate that uninsured motorists coverage was not selected within the Auto liability section, but NORMA also took steps to affirmatively reject such coverage.[5]

5. The rejection form signed by Tribby does not specifically state that it refers to the Auto liability section, as opposed to, say, the Garagekeepers liability section. Indeed, given that the policy *already* excluded uninsured motorists coverage in the Auto liability section, an argument can certainly be made that the rejection form must refer to some other section. The parties, however, seem to agree that the rejection form refers to the Auto liability section, and the Court finds this is an undisputed fact for the purpose of this Order.

### iii. The Guaranty Policy.

In addition to the $1 million St. Paul excess insurance policy, Highland also obtained some protection through an additional umbrella liability insurance policy issued by Guaranty. The only named insured under the Guaranty policy, however, is NORMA; the 13 individual members are not named. Guaranty policy form 01–UM–2102 at 1. In exchange for a premium of $51,989, Guaranty provided NORMA with an additional $9 million of insurance coverage for "each occurrence;" the Guaranty policy referred specifically to the St. Paul policy as "underlying insurance." *Id.*; Guaranty policy form 00–UM–3813 at 1. The Guaranty policy term is identical to the St. Paul policy term—October 1, 1998 through October 1, 1999. The precise coverages afforded by the Guaranty policy are stated as follows:

**Coverage A**

[Guaranty] will pay on your behalf those sums that you become legally obligated to pay as damages arising out of an "Occurrence" which are in excess of the "Underlying Insurance" .... The coverage provisions of the scheduled "Underlying Policies" are incorporated as part of this policy except for ... Uninsured or Underinsured Motorist Coverage ....

This insurance applies only to "Bodily Injury," "Personal Injury," "Property Damage," or "Advertising Injury" which occurs during the policy period.

**Coverage B**

With respect to any loss covered by the terms and conditions of this policy, but not covered as warranted by the "Underlying Policies" ... or any other "Underlying Insured," we will pay on your behalf for loss caused by an "Occurrence" which is in excess of the "Retained Limit" for liability imposed on you by law or assumed by you under contract for "Bodily Injury," "Personal Injury," "Property Damage," or "Advertising Injury."

This insurance applies only to "Bodily Injury," "Personal Injury," "Property Damage," or "Advertising Injury" which occurs during the policy period. * * *

Guaranty policy form 00–UM–2103A at 1.

The Guaranty policy goes on to list a number of "exclusions," stating that "this insurance does not apply" to "Bodily Injury," "Property Damage," or "Personal Injury" that "arises from any state's Uninsured or Underinsured Motorist Laws." *Id.* at 5, 7. The policy also includes an "Automobile Following Form," which states that no coverage is provided for "any liability arising out of ownership, maintenance, operation, use, loading, or unloading of any automobile," except that this exclusion does not apply "if such liability is covered by valid and collectible underlying insurance ..., and then only for such liability for which coverage is afforded under said underlying insurance." Guaranty policy form 00–UMB–3019 at 1.

In the same way that NORMA affirmatively sought to reject uninsured motorists coverage from St. Paul, NORMA also took action to affirmatively reject uninsured motorists coverage from Guaranty. Specifically, on February 17, 1999—four months after the policy inception date, and four months before Comella's accident—NORMA president Robert Tribby signed a Guaranty form that stated:

The undersigned (and each of them) hereby rejects uninsured and underinsured motorists coverage. The undersigned (and each of them) understands and agrees that the provisions of the uninsured and underinsured motorists coverage will not be included in the policy issued and waives any protection of the Ohio statutes in that respect.

Guaranty policy form 00–UMB–3109OH.

The ultimate intended effect of NORMA's purchase of the St. Paul and Guaran-

ty insurance policies can be explained as follows. If Highland incurred a liability of, say, $15 million, and the incident that gave rise to this liability was covered under the insurance policies, then the liability would be paid for as follows: (1) Highland would pay the first $2,500; (2) NORMA would pay the next $150,000; (3) St. Paul would pay the next $1 million; (4) Guaranty would pay the next $10 million; and (5) Highland would remain responsible for the remaining $3,847,500 of liability.

### 2. Applicable Law.

The two seminal Ohio cases involving uninsured/underinsured motorists ("UM/UIM") coverage are *Scott–Pontzer v. Liberty Mut. Fire Ins. Co.*, 85 Ohio St.3d 660, 710 N.E.2d 1116 (1999), and *Linko v. Indemnity Ins. Co. of N. Am.*, 90 Ohio St.3d 445, 739 N.E.2d 338 (2000). Both of these cases examine and interpret Ohio Rev.Code § 3937.18, the insurance statute that addresses UM/UIM coverage. The parties urgently argue alternative applications of the holdings in *Scott–Pontzer* and *Linko* to the facts of this case.

Before setting out what appear to be the rules enunciated in *Scott–Pontzer* and *Linko*, the Court turns to the history of the statute. Ohio Rev.Code § 3937.18 has been modified several times over the last few years—specifically, on September 21, 2000, November 2, 1999, September 3, 1997, and October 20, 1994. This Court,

accordingly, has examined the interpretive case law in light of that history.[6]

The January 5, 1988 version—which the Ohio Supreme Court examined in *Scott–Pontzer*[7]—provided that no automobile liability insurance policy could be written in Ohio unless both uninsured motorist bodily injury coverage and underinsured motorist bodily injury coverage were also provided, and that the "amount of [such] coverage [must be] equivalent to the automobile liability ... coverage." Ohio Rev.Code § 3937.18(A) (Jan. 5, 1997). In other words, if an insurance company issued an automobile policy providing $100,000 coverage for bodily injury caused by the insured to another person, the policy also had to provide $100,000 coverage to the insured for bodily injury he suffered, himself, when caused by an uninsured or underinsured motorist. The statute went on, however, to provide that the named insured could reject these two coverages, as long as he did so in tandem: "[t]he named insured may only reject or accept both coverages"—and the insured could also choose to obtain these coverages for "optional lesser amounts." Ohio Rev.Code § 3937.18(C) (Jan. 5, 1997). In other words, the insured could: (1) choose not to buy *any* UM/UIM coverage, despite the statute's requirement that the insurer offer it; or (2) chose to buy, for example, only $50,000 of UM/UIM coverage, even

---

**6.** It appears that the statute may be substantially amended again in the near future. *See, e.g.*, 2001 Ohio House Bill 257 (an "emergency measure," introduced on May 15, 2001, designed to "supersede the holdings" of *Scott–Pontzer* and *Linko* ); 2001 Ohio Senate Bill 97 (same, introduced on May 1, 2001). It is unlikely, however, that any new statute would, or even could, be applied retroactively to this case.

**7.** The plaintiff in *Scott–Pontzer* sued under an insurance policy contract that was apparently

signed during 1993 or 1994—the accident that injured the plaintiff's decedent in that case occurred on July 10, 1994. Accordingly, the January 5, 1988 version of Ohio Rev.Code § 3937.18 applied to the insurance policies at issue in that case. *See Ross v. Farmers Ins. Group of Cos.* 82 Ohio St.3d 281, 695 N.E.2d 732, 734–35 (1998) (the statutory law at the time of contracting, not the time of the accident nor the time of exhaustion of available underlying liability coverage, governs a claim for underinsured motorists coverage).

though he bought a policy providing $100,000 of bodily injury coverage.

The October 20, 1994 version of § 3937.18—which the Ohio Supreme Court examined in *Linko*[8]—included certain changes to subsections (A) and (C). The essence of these two subsections of the statute, however, stayed the same: insurers had to provide UM/UIM bodily injury coverage in the same amounts as the bodily injury automobile liability coverage, and the insured could reject the two coverages or elect to buy them at lower limits. The 1994 modifications to the statute did not address the requirement that insurers had to provide insureds an option to buy UM/UIM coverage in certain amounts, or the provision that the insured could reject this coverage.[9]

On October 1, 1998, when NORMA entered into the contracts with St. Paul and Guaranty, the applicable version of the statute was the September 3, 1997 enactment. With this version, Ohio made no important changes to the requirement, set out in subsection (A), that every automobile liability insurance policy written in Ohio had to provide UM/UIM bodily inju-

ry coverage, and that the "amount of [such] coverage [must be] equivalent to the automobile liability ... coverage." Ohio Rev.Code § 3937.18(A) (Sept. 3, 1997).[10] This version did, however, make significant changes to subsection (C), which addresses the insured's right to reject UM/UIM coverage. The statute clarified that "[a] named insured or applicant may reject or accept both [uninsured and underinsured motorist] coverages ... or may alternatively select both such coverages in accordance with a schedule of limits approved by the superintendent." Ohio Rev.Code § 3937.18(C) (Sept. 3, 1997). The statute then added that any such choice had to meet certain requirements:

> A named insured's or applicant's rejection of [UM/UIM] coverages ..., or a named insured's or applicant's selection of [lower amounts of] such coverages ..., shall be in writing and shall be signed by the named insured or applicant. A named insured's or applicant's written, signed rejection ... [or] selection of such coverages ... shall be effective on the day signed, shall create a presumption of an offer of coverages

---

8. The *Linko* Court was careful to note that it was examining the October 20, 1994 version of Ohio Rev.Code § 3937.18. *Linko*, 739 N.E.2d at 341 (examining "former R.C. § 3937.18(C) as it existed during the policy period," and citing 145 Ohio Laws, Part I, 211).

9. The Act passed by the Ohio General Assembly modifying § 3937.18 explained that the purpose of the Act was, *inter alia*, "to require insurers to offer property damage liability insurance as part of uninsured motorist coverage; to eliminate certain limitations on the recovery of damages under the Uninsured and Underinsured Motorist Coverage Law; to prohibit insurers from raising an insured's motor vehicle insurance premium based on the insured's involvement in a motor vehicle accident for which the insured was not at fault or in an accident with an uninsured or underinsured motorist for which the insured

was not at fault; to permit automobile liability insurance policies to preclude all stacking of coverages; [and] to declare that underinsured motorist coverage is not excess coverage." 1994 Ohio Laws File 184 (S.B.20), 145 Ohio Laws, Part I, 204. The Act did not address itself to the provisions mandating the provision of UM/UIM bodily injury coverage or allowing an insured to reject it.

10. The September 3, 1997 modifications to subsection (A) of § 3937 .18 included: (1) the provision that "bodily injury" also included sickness and disease; (2) limits on the insured's right to recover when the owner of the uninsured motor vehicle had an immunity; and (3) clarifying that the insurer had to "offer" UM/UIM coverage, which the insured could reject, and not "provide" such coverage. 1997 Ohio Laws File 28 (H.B.261), 147 Ohio Laws 2372.

consistent with division (A) of this section, and shall be binding on all other named insureds, insureds, or applicants. *Id.* In other words, if the insured wanted to reject UM/UIM coverage or buy lower limits, then he had to do so in writing. Also, an insured's written rejection/selection form created a presumption that the insurance company had offered UM/UIM coverage, as required.

This September 3, 1997 amendment to § 3937.18(C) was apparently in response to the Ohio Supreme Court's then-recent ruling in *Gyori v. Johnston Coca–Cola Bottling Group, Inc.*, 76 Ohio St.3d 565, 669 N.E.2d 824 (1996). In *Gyori*, the Ohio Supreme Court ruled that: (1) both the insurance company's offer of UM/UIM coverage and the insured's rejection must be in writing; (2) to be valid, a rejection must be received by the insurance company prior to the commencement of the policy year; and (3) the burden was on the insurance company to show the insured made a knowing and valid rejection of UM/UIM coverage. In response, the September 3, 1997 amendments: (1) codified *Gyori* 's requirement that the insured's rejection of coverage must be in writing; (2) invalidated *Gyori* 's requirement that the rejection must be received prior to the commencement of the policy year, instead allowing an insured to reject the coverage going forward, after the policy had incepted; and (3) changed the burden an insurance company bore to prove the insured had rejected UM/UIM coverage. Precisely *how* the burden was changed is the focus of the questions this Court now seeks to certify.

Having set out this statutory history, this Court can now examine *Scott–Pontzer* and *Linko*. In *Scott–Pontzer*, the Ohio Supreme Court examined two insurance policies issued to Superior Dairy, a "corporate entity." 710 N.E.2d at 1119. The first policy was a contract for "commercial automobile liability insurance" that "contained a provision for underinsured motorist coverage." *Id.* at 1117. The second policy was an "umbrella/excess policy." *Id.* Chris Pontzer, an employee of Superior Dairy, was killed by an underinsured motorist. Even though Pontzer was "not [acting] within the scope of his employment when the accident occurred," his wife sued to obtain underinsured motorists benefits under the two Superior Dairy policies. *Id.* at 1118.

The *Scott–Pontzer* Court held that Pontzer's wife was entitled to coverage under both policies. The Supreme Court first noted that the named insured in the commercial automobile liability insurance policy was "Superior Dairy." The Court ruled that "Superior Dairy ... includes Superior's employees, since a corporation can act only by and through real live persons." *Id.* at 1119 (noting that "policies of insurance, which are in language selected by the insurer and which are reasonably open to different interpretation, will be construed most favorably to the insured"). Thus, Pontzer was an insured under the first insurance policy, entitled to the UM/UIM coverage that policy provided.

The *Scott–Pontzer* Court next noted that the insurance company had "failed to offer [UM/UIM] coverage under Superior Dairy's umbrella/excess coverage insurance policy." *Id.* at 1120. The Supreme Court affirmed its prior holding that "excess liability insurance must comport with R.C. § 3937.18"—specifically, the requirement contained in subsection (A) that every automobile liability insurance policy written in Ohio had to provide equal amounts of UM/UIM bodily injury coverage—and also affirmed its prior ruling that "failure by the insurer to offer such coverage results in the provision of such coverage by operation of law." *Id.* The Supreme Court clarified that, "[a]bsent any

showing that underinsured coverage was offered and rejected, such coverage is included [automatically] in the policy." *Id.*

Finally, the *Scott–Pontzer* Court addressed the fact that Pontzer was not acting within the scope of his employment when he was killed in the automobile accident. The Supreme Court found that the commercial automobile liability insurance policy "contains no language requiring that employees must be acting within the scope of their employment in order to receive underinsured motorist coverage," so the plaintiff was "entitled to underinsured motorist benefits" under that policy. *Id.* Turning to the umbrella/excess policy, the Supreme Court noted that this contract "did restrict coverage to employees acting within the scope of their employment." *Id.* But the Supreme Court found this exclusion inapplicable to UM/UIM coverage:

> [W]e have already found that [the insurer] failed to offer underinsured motorist coverage through the umbrella policy issued to Superior Dairy. Thus, any language in the . . . umbrella policy restricting insurance coverage was intended to apply solely to excess liability coverage and not for purposes of underinsured motorist coverage. Therefore, there is no requirement in the umbrella policy that Pontzer had to be acting during the scope of his employment to qualify for underinsured motorist coverage. Therefore, appellant is entitled to underinsured motorist benefits under the . . . umbrella policy as well.

*Id.* (citation omitted).

The *Scott–Pontzer* Court concluded, "[w]e realize that the conclusion reached herein may be viewed by some as a result that was not intended by the parties to the insurance contracts at issue. * * * [But]

we will not guess at the intent of the parties to the insurance contract when the insurer introduces ambiguous terms into the policy." *Id.* at 1120–21.

In *Linko,* a business automobile insurance policy had been issued to a number of related corporate entities doing business in several states, including one known as the Norton Company. *Linko,* 739 N.E.2d at 340.[11] Pursuant to Ohio Rev.Code § 3937 .18(C) and similar statutes in other states, the insurance company sent a number of "selection forms" to Norton; these forms were "used for the rejection of UM/UIM coverage under the laws of particular states." *Id.* The Ohio selection form listed only Norton as a named insured, and not any of the related corporate entities. Norton signed and returned the form rejecting UM/UIM coverage in Ohio.

Thereafter, Michael Linko, an Ohio employee of a Norton subsidiary known as SGIC, was killed in an automobile accident while in the course of his employment. Linko was an insured under the bodily injury liability coverage of the business automobile policy issued to Norton. *Id.* at 339–40. Linko's wife sought underinsured motorists coverage benefits under the commercial automobile policy, despite Norton having signed the "selection form" rejecting all UM/UIM coverage in Ohio. In the course of its analysis, the *Linko* Court reached several conclusions. First, the Supreme Court discussed the "offer requirements of *former* R.C. 3937.18(C) *as it existed during the policy period.*" *Id.* at 341 (referring to the October 20, 1994 version of § 3937.18). The Supreme Court held that, not only did the offer and rejection of UM/UIM coverage have to be in writing, as explicitly stated in the statute, the written offer also had to include "a

11. Specifically, the insurance policy was issued to company called CSG, which owned a company called SGC, which owned the Norton Company, which owned a company called SGAMC, which owned a company called SGIC. *Linko,* 739 N.E.2d at 340.

brief description of the coverage, the premium for that coverage, and an express statement of the UM/UIM coverage limits." *Id.* at 342. Because the "selection form" signed by Norton did not contain any of this information, it "could not be termed a written offer that would allow an insured to make an express, knowing rejection of the coverage." *Id.*

The *Linko* Court also examined the question of "[w]hether each of several separately-incorporated named insureds must be expressly listed in the rejection form in order to satisfy the requirement that the waiver be made knowingly, expressly, and in writing by each named insured." *Id.* In a word, the answer was "yes." The Supreme Court held that, even though "a parent corporation [Norton] may have a close relationship with its subsidiary [Linko's actual employer, SGIC], the two remain separate and distinct legal entities." *Id.* As such, absent written authorization, Norton's rejection of UM/UIM coverage was not valid as to SGIC, even though neither Norton, SGIC, nor the insurance company challenged Norton's authority to bind SGIC. *Id.* at 341–43.

### 3. Basis for Certification.

A key question in this case—and probably in a number of other cases pending in state and federal court—is whether the presumption set out in the more recent versions of Ohio Rev.Code § 3937.18(C) is conclusive or rebuttable.[12] Unlike other Ohio statutes, § 3937.18(C) does not reveal the answer explicitly. *See* Ohio Rev.Code § 1311.12(B) ("delivery of materials to the site of the improvement ... creates a *conclusive presumption* that the materials were used in the course of the improvement"); Ohio Rev.Code § 1327.59 ("[p]roof of the existence of a ... measuring device in or about any building ... creates a *rebuttable presumption* of the use of such ... device for commercial purposes ... by the person in charge of such building"); Ohio Rev.Code § 5747.24(B)(2) ("[t]he *presumption* that the individual was not domiciled in this state is *irrebuttable* unless the individual fails to submit the statement [so saying] as required") (all parenthetical emphasis added). *Compare Liberty Mut. Ins. Co., Inc. v. Ledford,* 729 So.2d 426 (Fla.Ct.App.1999) (examining Fla. Stat. Ann. § 627.727(1) (1991), which stated that, if the insured signed a UM insurance rejection form, "it will be *conclusively presumed* that there was an informed, knowing rejection of coverage or election of lower limits on behalf of all insureds") ( emphasis added).

If the presumption is conclusive, it is possible that the Comellas' claims in this case would be foreclosed by the written rejection forms, applicable to the St. Paul and Guaranty insurance policies, signed by NORMA on behalf of Highland.[13]

If the presumption is rebuttable, the question then becomes how may the presumption be rebutted? For example, may the presumption be rebutted simply by showing that the insurance company never

---

12. *See, e.g., Hindall v. Winterthur Int'l,* 2001 WL 339459 (N.D.Ohio March 29, 2001). In *Hindall,* the plaintiff argued, inter alia, that his employer's rejection of UM/UIM coverage was not effective under *Linko.* The *Hindall* Court rejected this argument, noting that *Linko* had construed the October 20, 1994 version of § 3937.18, while the policy at issue was governed by the September 3, 1997 version: "under the current statute, the rejection form signed by Philips ... creates a presump-

tion of a valid offer under the statute, and no separate, written offer is required." *Id.* The *Hindall* Court, however, did not address the question of whether or how the presumption could be rebutted.

13. The Court has not yet determined whether the status of the statutory presumption, alone, is outcome-determinative in this case. It is clear, however, that the answer to this question is critical to the analysis.

made a *written* offer of coverage [14] or that the offer, no matter how conveyed, failed to contain all the elements referred to in *Linko*—"a brief description of the coverage, the premium for that coverage, and an express statement of the UM/UIM coverage limits?" *Linko*, 739 N.E.2d at 342. Or, may the presumption only be rebutted by a showing that the insured's rejection of UM/UIM coverage was not a knowing one? [15] Or, does yet some other standard apply?

■ The answers to these questions turn on legislative intent. *See* Ohio Rev. Code § .149 (setting out what factors a court may consider "if a statute is ambiguous, . . . in determining the intention of the legislature"); *Wolfe v. Wolfe*, 88 Ohio St.3d 246, 725 N.E.2d 261, 264 (2000) (setting out rules regarding the interpretation of an ambiguous insurance statute, and suggesting that legislative intent is paramount). The defendants in this case insist that neither *Scott–Pontzer* nor *Linko* serve to reveal legislative intent, because both cases examine *former* versions of Ohio Rev.Code § 3937.18. Indeed, both the majority and dissenting opinions in *Linko* are careful to note that the Court is referring

to "*former* R.C. 3937.18(C)." *Linko*, 739 N.E.2d at 341, 344 (referring to the October 20, 1994 version of § 3937.18). As noted above, the version of § 3937.19 applicable in *this* case was enacted on September 3, 1997, after the versions discussed in *Scott–Pontzer* and *Linko*. The Ohio Supreme Court has been careful to state that, "for the purpose of determining the scope of coverage of an underinsured motorist claim, the statutory law in effect *at the time of entering into a contract* for automobile liability insurance controls the rights and duties of the contracting parties." *Ross v. Farmers Ins. Group of Cos.* 82 Ohio St.3d 281, 695 N.E.2d 732, 738 (1998).[16]

■ The Court agrees with the defendants that the degree to which the reasoning of *Scott–Pontzer* and *Linko* applies to this case, in light of the statutory amendments, is unclear. Because this Court is unable to ascertain the intent of the Ohio General Assembly, and is not confident it can predict how the Ohio Supreme Court would answer the question of legislative intent as it pertains to the presumption added by the 1997 amendments,[17] the Court concludes that certification of these

14. Because the 1997 amendments were designed, at least in part, to obviate the need for a written offer when the insured had executed a written rejection, it seems unlikely that the presumption could be so easily rebutted. As noted, however, this Court is disinclined to speculate on this potentially dispositive issue.

15. For example, can the presumption be rebutted if there is testimony to the effect that the insured and insurer discussed the availability of UM/UIM coverage, options, and the insured chose to reject the coverage?

16. *But see Schumacher v. Kreiner*, 88 Ohio St.3d 358, 725 N.E.2d 1138 (2000). In *Schumacher*, the insurance contract at issue had been entered into some time before November 17, 1994, when the plaintiff was injured. *Id.*

at 1139. But the Ohio Supreme Court referred to a version of § 3937.18(C) that included language not added until September 3, 1997. *Id.* at 1140. *See also Jewett v. Owners Ins. Co.*, 82 Ohio St.3d 1224, 696 N.E.2d 598, 598–99 (1998) (Cook, J., dissenting) ("[d]espite holding in *Ross* that the date of contracting determines which version of R.C. § 3937.18 applies, the majority nevertheless lets stand the [lower] court's ruling, applying the [different] law in effect on the accident date").

17. "In the absence of a controlling decision on the issue at hand, federal courts exercising diversity jurisdiction must attempt to predict how the state courts will act in the future." *Hines v. Joy Mfg. Co.*, 850 F.2d 1146, 1150 (6th Cir.1988).

questions presents the safest and surest route to the correct answers.

**IT IS SO ORDERED.**